**WILSON & CO., Inc., v. NATIONAL LABOR RELATIONS BOARD.**

**No. 7440.**

Circuit Court of Appeals, Seventh Circuit.

June 24, 1941.

Bernard G. Segal and Gilbert W. Oswald, both of Philadelphia, Pa., and Paul Ware, of Chicago, Ill., for petitioner.

Robert B. Watts, Gen. Counsel, NLRB, of Washington, D. C., I. S. Dorfman, NLRB, of Chicago, Ill., and Ruth Weyand, NLRB, of Washington, D. C., for respondent.

Before MAJOR and KERNER, Circuit Judges, and BRIGGLE, District Judge.

MAJOR, Circuit Judge.

This is a petition to review and set aside in part an order of the Labor Board, entered August 26, 1940, against petitioner. The Board in its answer requests enforcement of its order. Petitioner, under the name of J. Eavenson and Sons, operates a soap manufacturing plant located at Camden, New Jersey, and has its principal office in Chicago, Illinois. Jurisdiction is not in dispute.

A charge was filed against petitioner April 3, 1939, by United Soap Workers Local Industrial Union No. 931 (hereinafter called the "Union"). An amended charge was filed July 7, 1939, and a second amended charge on July 25, 1939, upon which complaint issued. On the same date a second amended complaint issued upon which the proceeding was had. This complaint was predicated upon Section 10 of the Act, § 160 et seq., Title 29 U.S.C.A. In the meantime a separate representation proceeding was filed by the Union under Section 9 of the Act, and consolidated by order of the Board with the proceeding under Section 10, which resulted in the Board's direction that an election be held among petitioner's eligible employees to determine whether they desired the Union as the collective bargaining agent. In its petition for review, petitioner seeks inter alia to review and set aside this direction of election. The Board, on October 21, 1940, in connection with its answer requesting enforcement, moved for a dismissal of that part of the petition which seeks to review the order directing an election. The motion to dismiss was, by this Court, continued to the hearing on the merits. The Board continues to urge that this Court is without power to review its Direction of Election. It urges that no part of the Board's order in the Section 10 case is based upon any fact certified in the Section 9 proceeding. That the Board's position is sound is no longer open to question. As the Court said in National Labor Relations Board v. Falk Corp., 308 U.S. 453, 459, 60 S.Ct. 307, 311, 84 L.Ed. 396: "* * * There can be no court review under 9 (d) until the Board issues an order and requires the employer to do something predicated upon the result of an election."

The motion to dismiss that portion of the petition which seeks a review of the proceeding under Section 9 is, therefore, allowed.

A hearing, commencing August 7, 1939, and terminating September 25, 1939, was had before a Trial Examiner who issued his intermediate report January 10, 1940. The unfair labor practices contained in the amended complaint upon which the hearing was had may be briefly summarized as follows: (1) That petitioner refused to bargain collectively with the Union and refused to embody in the form of a written contract any agreement reached, and at all times thereafter refused to bargain collectively with the Union in violation of Sections 7 and 8 (1) and (5) of the Act. (2) That as a result of the acts thus charged a strike occurred on March 31, 1939. (3) That petitioner interfered with the rights of its employees under Section 7 of the Act by (a) visits and telephone calls of certain of its fore-

916

men to the homes of striking employees to inform the latter and their families of the futility of the strike and the advisability of abandoning it, and soliciting the return of individual strikers on individual terms; (b) by circulating on or about April 24, 1939, a letter to all employees threatening the loss of their jobs and the closing of the plant if the strikers did not abandon the strike and concerted activities; (c) by inciting violence and instigating attacks against Union leaders and strikers on the picket lines on May 5, 1939, and at other specified times; and (d) by making intimidatory anti-Union statements throughout the strike, decrying membership in the Union, disparaging leaders and members of the Union and advising against the Union. It was charged that these alleged activities violated Section 8 (1) of the Act. (4) That the Union terminated the strike on July 21, 1939, and the striking employees individually and through the Union requested reinstatement to their positions, but that petitioner refused to reinstate them because of their Union activities and their participation in the strike, thereby violating Section 8 (1) of the Act, and discriminating with regard to the hire and tenure of the striking employees, contrary to Section 8 (3). Petitioner answered the complaint, denying all alleged violations.

Of the Trial Examiner and the three members of the Board who participated in the decision, no two agreed as to the disposition which should be made of the case. In his report the Trial Examiner completely exonerated petitioner as to charges 1, 2, and 3 (c) and (d), and 4. He was of the view that petitioner had committed an unfair labor practice only as stated' in Paragraph 3 (a) and (b). By its decision the Board found petitioner guilty of the charge stated in 3 (a) and (b) as recommended by the Examiner, and 4, contrary to the recommendation of the Examiner. The Board, as the Examiner, exonerated petitioner as to the charges stated in 1, 2 and 3 (c) and (d). One member of the Board, who joined in the majority decision, wrote a concurring opinion expressing the view that petitioner was guilty of all charges. Another member dissented from the Board's decision except insofar as it was in conformity with the recommendations of the Trial Examiner. In such dissent he stated: "I have read the record in this case, and I find that the

Intermediate Report of the Trial Examiner gives a more adequate and judicious summary of the facts in the record than is contained in the majority opinion drafted by the Review Division. The conclusion of the Trial Examiner as to the merits of the complaints also seem to me a more adequate and judicious decision."

Therefore, the issue for decision is whether the Board was justified in its conclusion that petitioner was guilty of a violation of Section 7 of the Act, and thereby a violation of Section 8 (1) and (3). To sustain its conclusion as to a violation of 8 (1), the Board relies upon a letter sent by petitioner under date of April 24, 1939, to its employees, including those on strike, and statements made by certain supervisory employees. Its conclusion as to a violation of 8 (3) is based upon petitioner's position with reference to reinstatement of striking employees.

There is little, if any, dispute as to the facts as reported by the Examiner or as found by the Board. It is the conclusions drawn from such facts that give rise to the controversy. Therefore, it appears that the facts being conceded in the main, or at any rate not in dispute, we are confronted largely with legal rather than factual problems. In some instances, however, the conclusions of the Board are predicated upon inferences drawn from undisputed facts which also present for consideration the question as to whether such inferences are justifiable or substantially supported.

The Board acquiesces in the Examiner's report that petitioner at all times performed its full duty in bargaining with the Union; that petitioner was not responsible for the strike, and that petitioner was not guilty of inciting violence and instigating attacks against Union leaders and strikers. It is therefore unnecessary to make a statement of facts relating to those issues. In fairness to petitioner, however, it appears that a brief statement should be made of the situation as it existed and developed up to the time of the crucial issue—that is, petitioner's position with reference to the reinstatement of the strikers.

An organizer for the C. I. O. commenced the organization of the Union in January, 1939, and a charter was obtained February 11, 1939. About that time a committee of the Union met with petition-

er and requested that it be recognized as the bargaining agent. There is no contention and no evidence that petitioner interfered in any manner with the organization of the Union, or that it at any time questioned the Union's majority status. It recognized it from the beginning to the end of the controversy as the sole bargaining representative. The Union proposed a form of contract which was the subject of many conferences. Petitioner rejected some of the proposals and agreed to others. The chief item in dispute was the Union's demand for a substantial increase in wages. Petitioner took the position that this was financially impossible. In support of this position, it was explained to the Union that during the preceding fiscal year on gross sales of $250,000,000, petitioner had earned a net profit of only $19,-000. There is no contention by the Board but that petitioner's position in this respect was in good faith and it was so found by the Examiner.

At a meeting on March 30, the Union adopted a resolution concerning its proposed contract with petitioner, directed its negotiating committee to acquaint petitioner with the same, and to report back to a special meeting of the Union to be held on April 1. A meeting was arranged with petitioner for 4:30 P. M. on March 31. On the same date and prior to the hour at which the meeting was scheduled, some of the Union employees became suspicious that petitioner was accelerating shipment of products from the plant storage room. Without communicating such suspicions to petitioner, a telephone call was made to the Union organizer, who directed that in view of the scheduled meeting, no strike should be called. Despite this instruction, the negotiating committee decided to strike, and at 1:15 P. M., shortly prior to the scheduled meeting, a great majority of the employees went on strike. The Board acquiesced in the findings of the Trial Examiner to the effect that the strike was not caused, as contended by the Union, by any unfair labor practice on the part of petitioner, and "that there was not any factual basis for such belief."

Between March 31 and April 17, ten conferences were held between petitioner[1] and Union representatives, at which the main stumbling block was the Union's de-

mand for increased wages. The details of these conferences are not material, except as all now concede there was a good faith bargaining effort on the part of petitioner. At a meeting on April 12, a spokesman for the Union announced that a deadlock had been reached on the wage question and the situation would develop into a "dog eat dog" affair, and "that the Union would just have to put on the works." On April 17, a meeting was held at the suggestion of a Conciliator of the United States Department of Labor. During this conference the Union representatives departed without explanation, refusing to bargain, and no further conferences were held until May 17, when, at the request of the President of the Union, negotiations were resumed.

At this point it seems pertinent to consider the violence and illegal activities which accompanied the strike. On this phase of the case the record is voluminous, but space forbids that we do more than give a general resumé. Immediately after calling the strike, mass picketing was instituted. The record discloses the number of pickets on duty at 7:30 A. M. and 4:00 P. M. each day the strike was in progress. The highest number was 175, which represented substantially all the strikers. The average number in the picket line was around 75. The pickets marched in a circle, surrounded, and "ganged-up" on persons seeking entrance to the plant. Supervisors and non-strikers were threatened, and on some occasions forcibly barred from entrance. Shipment by rail was interfered with, and shipments in and out of the plant by truck were completely prevented. Pickets stopped freight cars approaching the loading platform, and a car of coal was upset over the tracks. As stated by the Board in its decision: "* * On other occasions, certain employees who attempted to enter or leave the plant with their automobiles were harassed and the windshields and windows of the automobiles were smashed. It also appears that the homes of several non-striking employees were damaged by rocks, paint, and acid thrown through windows and doors during two nights, about April 12 and April 25." On May 4, a group of nine workers left the plant to visit their families. Thirty or forty strikers attacked them with

[1] James Cooney, Vice President of Petitioner, acted as its spokesman at all conferences prior to April 7, 1939, and thereafter its representative was Maury Hopkins, Manager of petitioner's Industrial Relations Department.

rocks, bricks and sticks. One of the workers received injuries and was taken to a hospital for treatment. On May 5, the strikers made an attack on Hopkins, the petitioner's negotiator, and those accompanying him. He was chased, cornered and beaten on the head with a club, resulting in a wound to his scalp which required hospital treatment. The Union offered proof that this assault was provoked by Hopkins. Regarding this incident, the Board accepted the finding of the Examiner that—"* * * careful observation of the witnesses, and consideration of their respective testimony, impels the finding that the striking employees on the occasion in question made an unprovoked attack on Hopkins and those accompanying him. * * *" On June 11, a worker driving from the plant in his car was stopped by strikers who smashed the windows of his car with crank handles and iron bars. The worker left his car, and Stephen Domako, President of the Union, struck him with an iron bar, inflicting a wound which required him to be taken to a hospital.

These are merely a few of the many acts of violence which continued almost without interruption throughout the strike. At a meeting on June 29, held in the office of the Mayor of Camden, one of the Union organizers said to Hopkins that he would like to be on the "entertainment committee" and to have Hopkins as his "first customer." He also said to Hopkins: "We have run better men out of Camden than you are. In fact, we ran one man right out of this room." On April 19, a temporary injunction, subsequently made permanent, was issued by a New Jersey State Court, enjoining the officers, members, organizers and agents of the Union from all acts other than those incidental to legal picketing, and limited the number of pickets to twelve at one time. On May 29, nine striking employees were adjudged in contempt of the injunction and sentences or fines imposed, which cases were pending on appeal at the time of the Board hearing. Later, other strikers were adjudged in contempt whose cases had not been disposed of at the time of the hearing, and nine striking employees were indicted for malicious mischief, atrocious assault, battery and allied offenses. Among those indicted was Stephen Domako, President of the Union. The Board takes judicial notice of the records of the Camden County Court, which disclose that all of these cases, except one, have been dismissed or nolle prossed.

On April 17, when the Union broke off negotiations with petitioner, no attempt was made to operate the plant in any substantial respect. By that date it had been idle for more than two weeks.

█ This brings us to a consideration of certain incidents which the Board, in conformity with the Examiner's recommendation, concluded to be a violation of Section 8 (1) of the Act. The most important of these incidents is a letter signed "I. Katz, General Manager", sent by petitioner on April 24, 1939, "to all employees," including those on strike. This letter covers two full pages of the printed transcript. The Board's conclusion with reference to it is predicated upon the last paragraph. We think, however, that the entire letter must be read in order to properly evaluate its purport. In order to save some space, we shall not reproduce the letter in full. The first half contains a brief summary of the events which had transpired between petitioner and the Union. It appears to be a fair statement of the situation—at any rate no complaint is made concerning it. We produce in a footnote[2]

---

2 "We recognize the Union's right to call a strike, and our employees' right to go on strike if they wish. While an employee has a perfect right to refuse to work until his demands are met, we do not consider that a strike is the best means that is available for the settlement of disputes. Reasonable people ought to be able to settle their difficulties by negotiations and discussion, and thus avoid the loss that a strike causes both parties to the controversy. A strike always involves financial loss to the Company, and always involves financial loss to the employees who are striking, as well as a possible loss of their jobs.

"Most of our employees who are striking have worked for us for many years, and we are anxious to have them return to work and to continue working for us for many years more. Our employees know that we believe in good working conditions, and that we want to pay as high wages and grant as many other benefits as the returns from the business will justify. If we attempt to give our employees a greater portion of the return from the business than justified, ultimate ruin of the Company, and the loss of all our jobs is inevitable. All of our employees should be just as much interested to see that this does not happen as I am.

the last four paragraphs which, we think, must be considered together. Contrary to the Union's contention, the Board found the letter did not indicate petitioner would deal with the employees directly instead of through the Union, and also that it was not responsible for any prolongation of the strike. It also found that—"* * * The respondent (petitioner) at the time of the hearing had not made good its threat to treat all employees who failed to return to work on April 26 as having resigned from their positions. * * *" We think the Board also properly recognized that petitioner, up to that time having been guilty of no unfair labor practices, had a right to hire new employees to replace strikers.

After making these valid concessions, the Board takes the position that by the last paragraph of the letter, petitioner "did treat all of them as though they were no longer employees." Thus, so it concludes: "* * * Under all of the circumstances it is clear that by circulating the letter to all of the employees the respondent sought to influence them to abandon the Union and return to work. * * *" Thus the Board finds the letter did not indicate "that petitioner would deal with the employees directly instead of through the Union," but that petitioner "sought to influence them to abandon the Union and return to work." To us this is an anomaly which we shall make no attempt to solve. The Board's position rests entirely upon what it conceives to have been petitioner's intent. As stated, it is conceded that petitioner "had not made good its threat." In fairness, it must also be said there is not a scintilla of evidence that petitioner at any time discharged or sought to discharge, or refused reinstatement to any employee merely because of his participation in the strike. Also not a single member, so far as the record discloses, deserted the Union because of anything contained in this letter.

We think that petitioner's conduct, both prior and subsequent to the issuance of the letter, is material in construing what was intended or meant. If so, its conduct dispels the unfavorable inference drawn by the Board. In addition, the paragraphs of the letter which we have quoted, taken as a whole, as they must be, leave no room for such an inference. Furthermore, construing the last paragraph alone, as the Board did, it is not, in our judgment, susceptible of the construction given. As strikers, we assume that their names were already off the payroll, and as conceded by the Board, petitioner had the right to permanently employ others to take their places. The warning, if it may be termed such, which petitioner by this letter gave its striking employees as to what it proposed to do, was concerning matters within its legal province. From a legal standpoint, the letter was unnecessary. It is, however, additional evidence demonstrating petitioner's cautious attitude and desire to deal fairly with its striking employees. Under such circumstances, we disagree with the Board's construction that this letter was a restraint or coercion in violation of Section 8 (1).

In connection with the letter, the Board also relies upon three conversations participated in, or statements made, by supervisory employees which were found to demonstrate coercion on the part of petitioner. Two striking employees, Daniels and Smith, testified in substance that they were visited by Division Superintendent Gwin on the date of the issuance of the letter. Gwin requested that they read the letter and, according to Daniels, suggested —"* * * if I were you I would forget about the union and come back to work * * * the union is not doing anything for you. You know you have responsibilities, and you should forget about the union and come back to work." According to Smith, Gwin said to him: "It is going to be awfully tough for you, raising a young family, to stay out of work, * * *" and urged Smith's wife to persuade him of the error of remaining on strike, "* * being times were bad and I was so young and married; it would be hard to get a

"Our employees must realize that the plant cannot remain shut down any longer without serious destruction of our business, and that if our present employees remain unwilling to perform their duties, then the Company is forced to engage other employees to perform their jobs. We have been very patient, and have waited now for three weeks in the hope that our employees would return to work. We cannot wait longer, or there will be no work for any of us.

"Commencing Wednesday, April 26, we will resume operations at the plant, and those employees who do not report to work at their regular time, or furnish us some reason other than the strike, will be assumed to have resigned, and their names will be taken off our payroll, and other persons permanently engaged to perform their duties."

job doing anything right now." Gwin testified that when a decision was made to reopen the plant, he told the Plant Superintendent that he would like to have back some of his key employees, and asked permission to visit them, which permission was granted. Gwin, while admitting visiting Daniels and Smith, denied making the statements attributed to him. The Board found, however, that the statements were made and we accept the finding. Assuming that the statements are susceptible of the construction placed upon them, which we doubt, there is no evidence that the Superintendent, or any other officer of petitioner authorized them, or that they were made in conformity with petitioner's policy. In fact, the record demonstrates conclusively that petitioner's policy was to the contrary. There is not a scintilla of evidence but that petitioner fairly and in good faith intended and, we think as a matter of fact, did accord to the Union every right fixed by the Act. That the statements had no effect is evidenced by the fact that both Daniels and Smith remained on strike.

■ Another statement relied upon by the Board is that attributed to Chief Engineer Nutter who, on April 26, was found to have said to Engineer Keen (a Union member who was not on strike) that—"If I was you I would not go out because you have a family to keep, and you had better take care of them because there won't be no union in this place." It is inconceivable that the words "there won't be no union in this place" could have had any meaning for the reason that the Union had for months been in existence without any interferences on the part of petitioner, and recognized by it as the bargaining agent. That this statement had no effect is evidenced by the fact that Keen joined the strikers. Again, any unfavorable inference to be drawn from this statement is contrary to petitioner's undisputed policy.

It is rather remarkable that in this long drawn-out labor dispute, the statements just referred to are the only ones to which the Board attaches any significance. In our opinion they must be treated as isolated statements contrary to the proven policy of petitioner, and, as said by the Court in National Labor Relations Board v. Sands Manufacturing Co., 306 U.S. 332,

342, 59 S.Ct. 508, 513, 83 L.Ed. 682, in commenting upon a similar situation: " * * * their testimony does not, in any event, amount to a scintilla when considered in the light of respondent's long course of conduct in respect of union activities and in dealing freely and candidly with Mesa."

This brings us to the more important issue raised by petitioner's attitude concerning reinstatement of the striking employees, which the Board, contrary to the Examiner, concluded to be a violation of Section 8(3).

As already stated, the Union broke off negotiations on April 17, 1939, and no further conferences were had until May 17, when they were resumed at the request of the Union. Between that date and July 6, nineteen conferences were had between the Union and petitioner. During this period the Union insisted that all striking employees, without exception, be reinstated to their former positions. With reference to the reinstatement issue, petitioner's position on May 17, as found by the Board, was that—" * * * the company would take back the striking employees as soon as possible and as the business permitted; that we would endeavor, as time went on, to take back all the striking employees, if business permitted, except that we would not obligate ourselves to take back those who had engaged in unlawful or violent conduct; that each of those cases would have to be considered, and we did not know whether we could take them back or not." The Union refused to terminate the strike on the basis proposed. During the many conferences which followed, the main stumbling block to a settlement was petitioner's refusal to meet the demands of the Union that all striking employees be reinstated to their former positions. Petitioner repeated its position in this respect during at least six different conferences. On June 5, Conciliator Liller of the United States Department of Labor was again brought into the negotiation by the Union, and participated in the conference on that date, as well as others on subsequent dates. Liller advised petitioner that the Labor Board would order the reinstatement of all strikers even though they had been guilty of violent or unlawful conduct during the strike. At that time a substantial number of new employees had been engaged and had been promised permanent employment.[3]

---

[3] Just how many had been re-employed on June 5, we are not advised, but the record discloses that by May 20, petitioner had hired a total of 60 new employees.

At this conference Liller also proposed that petitioner reinstate all strikers except those who had engaged in overt violence, retaining any new employees whose retention did not operate to prevent strikers from returning. The Board found: "* * * The Union did not accept the Conciliator's proposal, as he also proposed that the respondent should have the right to retain new employees hired during the strike and no obligation was placed on the respondent to grant a wage increase. * * *" As to a June 9 conference, the Board found: "* * * On June 9 the respondent offered to recall 135 striking employees to work as soon as possible and within 30 days after the termination of the strike, on the condition (1) that the order of rehiring should be determined solely by the respondent, (2) that respondent would not be obligated to return to work those who had committed unlawful, violent, or criminal acts during the strike, the determination of the facts in this regard to be made solely by the respondent, and (3) that the Union agree that the respondent's failure to reinstate any employee found by the respondent to have engaged in such unlawful, violent, or criminal conduct should not be made the basis of any charges of unfair labor practices within the meaning of the Act. * * *"

Petitioner complains that the Board's conclusion with reference to this conference is not justified. We think it is substantially correct, except as to (3). What petitioner actually proposed was that "the Union should agree that a failure to take back any of those employees (referring to those engaged in unlawful violence or criminal acts during the strike) would not be an unfair labor practice."

On June 12, according to the Board's decision, Liller, as well as Union officials, proposed that petitioner reinstate all strikers and then discharge any "who might have been found guilty of overt acts of violence by a court." Petitioner did not agree to this proposal. On June 16, the Mayor of Camden was introduced into the negotiations by the Union. He proposed that 135 strikers be reinstated within 30 days and preferential listing be given the remainder, petitioner to be free to discharge any striker found guilty in criminal court, and new employees to be gradually eliminated. Both the Union and petitioner refused to accept this proposal, the Union insisting upon the immediate discharge of all new employees.

On June 22, petitioner amended its offer of June 9 and proposed to take back 85 striking employees within one week. On June 26, the Mayor proposed that petitioner agree to reinstate 149 strikers and leave the status of the remainder to the Labor Board. At that date petitioner had on its payroll 172 employees, of whom 149 had been hired to take the place of strikers. Although there were not sufficient places open to replace the number of strikers proposed, except by greatly increasing the force or discharging new employees, petitioner again offered to reinstate 135 of the strikers, which offer was kept open until July 6, when the negotiations ended. The Mayor also stated at this conference that the Union would insist upon all strikers being put back to work, and that it would go to the Labor Board with a complaint concerning those who were not reinstated, even though they might agree to a settlement in the matter.

At a June 28 conference, petitioner, for the first time, stated its position in written form. From this document the Board found petitioner's proposal to be as follows: "* * * (1) reinstatement of 135 striking employees under the same rates of pay and conditions of employment existing on March 31, the reinstatement of the remaining striking employees to be determined as previously proposed by the respondent; (2) retention by the respondent of employees hired since March 31; and (3) agreement by the Union to the withdrawal or dismissal of 'pending Labor Relations Board complaint or any that may be filed' with the Board, with a statement that the strike was not caused by any unfair labor practices on the respondent's part and that the strike was an 'attempt of the Union through economic pressure to obtain better working conditions.' * * *" While petitioner criticizes this construction of the written document, we think it is substantially correct except the phrase "or any that may be filed," as found in (3). There was nothing in petitioner's proposal, either on that date or on any other which required the dismissal of any charges which might be filed in the future. The proposal at all times referred to the charges of unfair labor practice then pending before the Board, or a concession that the refusal to reinstate those who had participated in violence should not constitute an unfair practice. The Union spokesman described this offer as an "epistle of hate" and termed Hopkins a "professional Union buster."

At conferences on June 30 and July 3, the Union representatives again insisted that all strikers be reinstated regardless of their conduct during the strike. At the latter conference petitioner's proposal, at the request of the Union attorney, was amended so as to provide that it would reinstate strikers "without discrimination." The Union attorney agreed that there were some strikers who should not be re-employed, but urged that they first be reinstated and later fired. Petitioner declined this suggestion.

On July 5 and 6, a meeting of the parties was held with the Mayor of which he offered to sit with petitioner as an arbitrator for those strikers who had engaged in violence or unlawful acts. Petitioner declined this suggestion on the ground that the Mayor was prejudiced and that the management was entitled to determine who of such strikers would make desirable employees. On July 6, negotiations ended, and on the following day the Union filed with the Board its amended charge.

On July 24, petitioner received from the Union notification that the strike had been terminated two days previously, and requested reinstatement of all strikers. Immediately upon receipt of such notice, petitioner ceased hiring new employees and thereafter all jobs were filled with strikers. At that time petitioner had on its payroll 220 employees, as many or more than it had at the commencement of the strike, of whom 13 were employees who did not strike, 19 were strikers who returned during the course of the strike, and 188 were new employees. Petitioner received applications of all strikers who requested reinstatement. Between July 24, and September 20, 1939, (the date on which the hearing commenced before the Examiner) 59 strikers had been reinstated. Also, from that date on it was the declared policy to refuse employment to anyone except as it might be able to find places for those who had participated in the strike.

On this record the Board concluded that petitioner, on July 3, was guilty of an unfair labor practice which prolonged the strike in violation of Section 7 of the Act, and that after the Union's request on July 22, for the reinstatement of all strikers, petitioner discriminated against the striking employees in violation of Section 8(3) and (1) of the Act. In our judgment the conclusion of the Board overlooks two important factors, admitted by it to exist—

(1) that the striking employees or, at any rate, a substantial portion of them, during the strike, engaged in violence and unlawful conduct, and (2) that the Union throughout the negotiations concerning reinstatement consistently demanded that all strikers, without exception, be reinstated.

A factor of less importance, ignored by the Board, is the background out of which the reinstatement issue arose, and which we have been taught to believe is entitled to consideration. Included therein are the admitted facts that petitioner recognized and at all times bargained with the Union in good faith; that the strike was called without any fault on the part of petitioner and against the advice of the organizer for the Union; that the representatives of the Union on April 17 walked out of a conference attended by petitioner and the Conciliator; and that a representative of the Union at that time threatened to "put on the works," and "to run Hopkins out of town."

■ It is unnecessary to restate the sustained, continued violence and unlawful conduct which attended the strike, admittedly without provocation. The rights and responsibilities of petitioner and the Union, as the representative of the striking employees, in our judgment, therefore, are of controlling importance. When the strike was called, even though under a misapprehension, as admitted by the Board, the strikers nevertheless retained their status as employees, and petitioner was required to accord them non-discriminatory treatment so long, at any rate, as the strike was conducted in a lawful manner. At what point the strike became unlawful does not appear necessary to decide for the reason that petitioner has made no contention either before the Board or here that the relation of employer and employee was severed, but merely that it had the right to determine which of those who engaged in violent and unlawful conduct it would rehire, or would make desirable employees.

From the beginning of the strike on March 31 until April 24, 1939, no effort was made by petitioner to replace its striking employees. On the latter date, a letter (discussed heretofore) was sent to all the employees advising them in effect that unless they returned to work, other persons would be permanently employed to take their places. As was said in National Labor Relations Board v. MacKay, etc., Co., 304 U.S. 333, 345, 58 S.Ct. 904, 911, 82 L.Ed.

1381: "* * * It does not follow that an employer, guilty of no act denounced by the statute, has lost the right to protect and continue his business by supplying places left vacant by strikers. * * *"

While an unfair labor charge had been lodged with the Board, it must be kept in mind that both the Trial Examiner and the Board exonerated petitioner of any unfair labor practice up to that time, and further, that the Board exonerated petitioner of any unfair labor practice which resulted in a prolongation of the strike until July 3. Shortly after April 24, it commenced the hiring of new employees, which it had a right to do, and by June 26, had on its payroll 149 of such employees who had been promised permanent employment. In addition, it had 23 old employees, making a total of 162, or only about 25 less than the number at the commencement of the strike.

In its brief the Board thus recognizes petitioner's right in this respect: "* * * This petitioner had, of course, the right to do until July 3, since theretofore the strike had been neither caused nor prolonged by its unfair labor practices. * * *"

The record does not disclose the number of petitioner's employees on July 3, but assuming they were the same as on June 26, it thus had 149 new employees which it was not obligated to discharge in order to make room for the strikers. As was said in the MacKay case, 304 U.S. page 345, 58 S.Ct. at page 911, 82 L.Ed. 1381: "* * * and he is not bound to discharge those hired to fill the places of strikers, upon the election of the latter to resume their employment, in order to create places for them." Thus it is apparent that on July 3, there were, at the most, not more than 25 places open to the striking employees. The sole duty resting upon petitioner at that time was to refrain from discriminating against them because of their Union activities or their participation in the strike, and this duty was upon the assumption that the strike was conducted in a lawful manner. Unfortunately, however, this was not the case.

The decision of this reinstatement issue must turn largely upon petitioner's position in insisting that it be permitted to decide which of those engaged in unlawful, violent and criminal conduct would make desirable employees, in the event of reinstatement. Petitioner did not seek to hide behind its undoubted right to refuse to replace striking employees because their places had been taken by others, or upon the tenable ground that those engaged in violent and unlawful conduct had severed their relations as employees and were no longer entitled to consideration. We think it is plain that in this respect petitioner's position was more favorable to the striking employees than the law required. As was said in National Labor Relations Board v. Fansteel Corp., 306 U.S. 240, 257, 59 S.Ct. 490, 497, 83 L.Ed. 627, 123 A.L.R. 599: "* * * There is not a line in the statute to warrant the conclusion that it is any part of the policies of the Act to encourage employees to resort to force and violence in defiance of the law of the land. * * *"

True, as pointed out, the court there was dealing with a different sort of violence, to-wit, the sit-down strike, but the language employed leaves no doubt but that it applies to the character of violence and unlawful conduct found in the instant case. The court, 306 U.S. page 253, 59 S.Ct. page 495, 83 L.Ed. 627, 123 A.L.R. 599, said: "* * * But in its legal aspect the ousting of the owner from lawful possession is not essentially different from an assault upon the officers of an employing company, * * *." Not only did the court hold that those who actually participated in the violence were not entitled to reinstatement, but also held, 306 U.S. page 261, 59 S.Ct. page 498, 83 L.Ed. 627, 123 A.L.R. 599, that—"* * * aiders and abettors, likewise guilty of unlawful conduct, are in no better case than the 'sit-down' strikers themselves. We find no ground for concluding that there is any policy of the Act which justifies the Board in ordering reinstatement in such circumstances."

In June, petitioner offered to take back 85 strikers in one week and 135 strikers in thirty days, which, under any view of the circumstances, was an offer more liberal than was required of it. But the fact that petitioner offered to reinstate more of the strikers than it was obligated to do, does not weigh against it. Concerning a similar point, the court in the Fansteel case, 306 U.S. page 259, 59 S.Ct. page 497, 83 L.Ed. 627, 123 A.L.R. 599, said: "* * * The important point is that respondent stood absolved by the conduct of those engaged in the 'sit-down' from any duty to reemploy them, but respondent was nevertheless free to consider the exigencies of its business and to offer reemployment if it chose. In so doing it was simply exer-

924

cising its normal right to select its employees."

■■■ The Board terms the attitude of petitioner as "autocratic," "a license to discriminate," and labels its purpose "to be the sole and final arbiter of the employees' destiny." There is no justification for thus designating petitioner's attitude. It is also said that petitioner was unwilling to submit to arbitration the question of reinstatement of those who had been guilty of violence and unlawful conduct, and that it refused to rely on the state courts for a determination of the question of the guilt or innocence of those so engaged. It is our view that petitioner had the right and responsibility of determining which of the strikers had engaged in unlawful conduct. In making such determination it would have acted at its own hazard and could not, under the Act, have discriminated against a striker under the guise that he had engaged in unlawful conduct. Petitioner is also criticized for refusing to agree to the proposal of the Mayor and the Conciliator that it reinstate all strikers and later discharge those who had participated in the unlawful conduct. This proposal was preposterous in view of the large number of new employees hired to take the places of the strikers, and which petitioner was under no duty to discharge—in fact it had obligated itself, as it had a right to do, to furnish them permanent employment. If petitioner had accepted this proposal, it would have taken a leap from the "frying pan into the fire." It is not difficult to vizualize that it would have been branded with brazen discrimination, especially if any active member of the Union, or leader of the strike, had been discharged.

■■■ The Board's conclusion places a premium upon the violence and unlawful conduct attending the strike. This is so notwithstanding the admission that such conduct was unprovoked. We concede, without reservation, the right of employees to strike. Such right is theirs either for good cause or no cause. The strike, however, must be conducted in a lawful manner. When so conducted, the striker retains his status as an employee and is protected by the Act. When unprovoked violence is resorted to, however, the striker, as held in the Fansteel case, is no longer protected, and what he thereafter obtains from the employer must be at the latter's discretion. It therefore appears that there is lit-tle, if any, room for argument but that petitioner was within its rights in its position that it be accorded the privilege of selecting from those guilty of violence, the ones which it would reinstate.

■■■ Other points are argued in support of the Board's conclusion. It is claimed petitioner refused to identify those of the Union members it might deem objectionable, and its admission that some of them "might be officials or otherwise prominent in the Union." We do not believe petitioner was required to name such persons in advance. That was a bridge to cross when application for reinstatement was made. If some of those who participated in violence and unlawful activities were officials of the Union, it did not minimize petitioner's right to refuse reinstatement. It is argued that petitioner failed to specify the types of conduct it might consider sufficient to bar reinstatement. At all times the conduct specified was "unlawful, violent and criminal acts," and we think that was sufficient. There runs through the Board's argument the covert suggestion that the unlawful activities were of such a minor character that the participants were not deprived of any rights under the Act. Respect for law and order demands the repudiation of such a suggestion. The effect of an unprovoked assault can not be made dependent upon the size of the club with which it is committed.

In this connection it appears that the Board has shifted the position it took in the matter of Republic Creosoting Co., 19 N.L.R.B., No. 30, decided January 9, 1940. In that case two striking employees were denied reinstatement on the ground that they had participated in an assault. They were acquitted of the charge in a state court. Nevertheless, the Board exonerated the employer on the ground that it "believed, not without reason," that the employees "were guilty of the assault."

■■■ It is also claimed that petitioner abandoned its long standing seniority policy. This is plausibly explained by the fact that petitioner had hired new employees in numbers sufficient to operate its plant. It was not obligated to replace them, and under such circumstances, its previous seniority practice could not be followed. It is also argued that petitioner attempted to secure immunity under the Act by including in its proposals the condition that the Union agree that a failure to take back

strikers who had engaged in violence and unlawful conduct, was not an unfair labor practice. This condition was proposed after petitioner had been told that regardless of any settlement made, it would be required to defend itself against an unfair practice. In addition, it had been told by the United States Conciliator that in such settlements, it was customary to dismiss charges pending before the Board. We agree that this condition, if accepted, would have been futile as a protective measure to petitioner. It would not have been binding upon the striking employees or the Board and perhaps not binding upon the Union. It amounted to nothing more than an agreement, however, as to a principle of law recognized in the Fansteel case. Furthermore, there is not the slightest reason to believe that petitioner's position would have been accepted by the Union without this condition, as the Union at all times was insisting that all strikers, without exception, be reinstated. The record is convincing that the only manner in which this strike could have been settled on July 3, or any subsequent time, was for petitioner to agree to discharge all newly hired employees and take back all strikers, regardless of their unlawful conduct. This it was not required to do.

The Board's conclusion that petitioner violated Section 8(3) and (1) of the Act rests upon the premise that petitioner, by its attitude on July 3 concerning reinstatement of the strikers, was an unfair labor practice which resulted in a prolongation of the strike. It finds that 35 new employees were hired between July 3 and July 22, (the date of the termination of the strike) and that when the strikers made application for reinstatement, petitioner was under a duty to discharge these 35 new employees and make room for that number of strikers. Petitioner's failure in this respect, so it is argued, was a discrimination against all of the striking employees. It perhaps is not material, but it is interesting to again observe that petitioner had often proposed to employ 135 strikers within 30 days and 85 within one week.

There is no occasion, however, to further discuss the Board's conclusion in this respect for the reason that the premise upon which it is predicated being unsound, it necessarily follows that the conclusion can not be approved.

The petition is allowed and the Board's request for enforcement is denied.