**WILSON & CO., Inc., v. NATIONAL LABOR RELATIONS BOARD.**

**No. 7630.**

Circuit Court of Appeals, Seventh Circuit.

Nov. 17, 1941.

Rehearing Denied Dec. 17, 1941.

846

Jas. D. Cooney, Paul Ware, and Richard C. Winkler, all of Chicago, Ill., for petitioner.

Robert B. Watts and Herbert Fuchs, both of Washington, D. C., I. S. Dorfman, of Chicago, Ill., and Laurence A. Knapp, Associate Gen. Counsel, Ernest A. Gross, Asst. Gen. Counsel, Morris P. Glushien, Samuel Edes, Helen F. Humphrey, Richard C. Barrett, and William Stix, Attys., National Labor Relations Board, all of Washington, D. C., for respondent.

Before EVANS, MAJOR, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

Wilson & Co., Inc., has petitioned to have an order of the National Labor Relations Board reviewed and set aside. The Board in its answer requests that its order be enforced.

The Board found that, following a strike which terminated on December 19, 1938, petitioner, in violation of Section 8(1) and (3) of the National Labor Relations Act, 29 U.S.C.A. § 158(1) (3), refused to reinstate twelve members of United Packinghouse Workers of America, Local No. 49, C. I. O., herein called the Union, because they had participated in the strike. Upon these findings the Board ordered petitioner to cease and desist from the unfair labor practices, to reinstate the employees with back pay, and to post appropriate notices.

■■■ Petitioner, a Delaware corporation having its principal place of business in Chicago, Illinois, is engaged in purchasing and slaughtering livestock and in the processing, sale, and distribution of meat and meat products. Its plants are operated in nine states; the products of these plants are sold by branch houses throughout the United States. During a representative twelve-month period, petitioner purchased livestock valued at approximately $127,000,000 and sold meat and meat products worth about $250,000,000. The unfair labor practice here involved occurred at seven branch houses in the metropolitan district of New York. During 1939 these branches sold about 95,000,000 pounds of meat and meat products, all of which were shipped to them from points outside of the state of New York. The meat and meat products were sold to local retail butchers and jobbers and none of it was sold and shipped to points outside of the state of New York. The Board concluded that the unfair labor practices had a close, intimate, and substantial relation to trade, traffic, and commerce among the several states, and tended to lead to labor disputes burdening and obstructing commerce and the free flow of commerce within the meaning of § 2(6) and (7) of the Act, 29 U.S.C.A. § 152(6, 7).

■■■ These facts, counsel for petitioner argues, show that interstate commerce was in no way obstructed or affected and that the products came to permanent rest within the state and have ceased to flow in interstate commerce. The fact that the commerce to be protected has come to rest in the state of New York is immaterial. If the obstructions incident to it result in an interruption of the free flow of interstate commerce, Congress has the power to regulate it. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 41, 42, 57 S.Ct. 615, 81 L.Ed. 893, 108 A. L.R. 1352; National Labor Relations Board v. Fainblatt, 306 U.S. 601, 604, 59 S.Ct. 668, 83 L.Ed. 1014; Virginia Electric & Power Co. v. N. L. R. B., 4 Cir., 115 F.2d 414; and National Labor Relations Board v. Schmidt Bakery Co., 4 Cir., 122 F.2d 162.

Petitioner next contends that the evidence does not warrant the conclusions drawn by the Board.

The facts adduced at the hearing showed that the Union commenced to organize petitioner's employees at its seven branches in the metropolitan area of New York City in September, 1937. Shortly thereafter petitioner informed the luggers [1] at the Fort Greene branch that owing to the fact that business had fallen below normal, it was necessary either to eliminate one lugger or adopt a plan of rotation whereby one lugger would be off for a week at a time. The

---

[1] A lugger is an employee who carries beef from a car to a hook on a trolley.

luggers decided to try the rotation plan. On October 9, petitioner's manager told one Levine (a lugger) not to report the following week; the luggers, however, having reconsidered the question, decided to oppose all lay-offs and informed the manager that none of them would work if any lay-off practice was put in effect. On October 11, after Levine was refused work, the luggers went on a strike. That afternoon, after the luggers had joined the Union, the strike was settled and the rotation plan was abandoned.

In November, 1938, after the Board had certified the Union as the bargaining representative of the employees of six of petitioner's branch houses, the Union presented a proposed bargaining contract, which provided, among other things, for a closed shop, seniority arrangement, wage increase, arbitration of grievances, 40-hour week and 8-hour day. Representatives of the Union and the petitioner then met and discussed the terms of the contract, but they reached no decision. At this conference petitioner's representative stated that a closed shop was against petitioner's policy, that a wage increase could not be granted, and that practically all of the other terms were objectionable. Thereafter the Union made further attempts to negotiate an agreement. We do not deem it necessary to set out in detail the evidence concerning the negotiations; suffice to say, the negotiations were unsuccessful and on December 12, 1938, a strike occurred at all seven branch houses. The Board found that the strike was not the result of an unfair labor practice, but was a labor dispute within the meaning of § 2(9) of the Act. On December 17, 1938, at a conference between representatives of the Union and the petitioner, attended also by a Department of Labor conciliator, the strike was terminated, and petitioner agreed to reinstate all strikers whose jobs had not been filled during the strike and to employ the remaining strikers as soon as positions for them became available.

During the five-day strike fifteen new men were hired at four branch houses and promised steady work. Pursuant to the settlement agreement, the strikers reported for work on December 19 and all but 12 of them were reinstated. Eleven of those applying for work were told that their positions had been filled by new employees hired during the strike, and that they would be reinstated as soon as work be-

came available. After the strike was terminated petitioner hired 12 new men, but none of the 11 strikers was reinstated, although they were qualified to perform the work for which the new men were hired. The 11 strikers who were not taken back had been employed prior to the strike at the Fort Greene, Jamaica, Westchester, and Mineola branch houses, and the 12 employees hired since the termination of the strike were taken on at these branches.

The proof also showed that petitioner's Vice President Cooney and District Manager Hawrey had indicated to some of the men seeking reinstatement that their participation in the strike foreclosed their chances of employment, e. g., shortly before the strike Cooney said "that in case of another strike we [the company] would be less inclined to take the men [the strikers] back." Hawrey, prior to the strike, had attempted to insure a vote against the Union by promises of favors to one Kolacz, a union shop chairman. After the strike Hawrey told Kolacz, "you know why you have lost your position. * * * Those are the things I warned you against some time ago."

The Board found that the failure to reinstate the men was motivated by a purpose to penalize them for engaging in legitimate concerted activities and therefore was discriminatory within the meaning of § 8(3) and (1) of the Act.

Petitioner insists that there is no support in the record for the inference that this was in fact petitioner's purpose, and it points to the fact that it never interfered with the Union's efforts to unionize the branch houses; that it granted all requests for meetings; that it gave numerous wage increases prior to December, 1938; that it shortened hours of work; that it gave vacations; that it agreed with the Union on additional holidays; and that it negotiated to conclusion innumerable matters pertaining to individuals and working conditions.

■ There is no dispute as to the evidence. The only question is,—What inference should be drawn from the evidence? Of course, that function belongs to the Board. National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307, and National Labor Relations Board v. Waterman, etc., 309 U.S. 206, 60 S.Ct. 493, 84 L.Ed. 704. The Board concluded

that the evidence and the reasonable inferences flowing therefrom established the fact that the petitioner had interfered with, restrained, and coerced its employees in their exercise of the rights guaranteed them by the statute, and that petitioner had discriminated against its employees in regard to hire and tenure of employment.

While it is true that during the strike the strikers remained employees within the meaning of the act, 29 U.S.C.A. § 151 et seq., yet petitioner was free to replace them and was not bound to discharge the new employees in order to create places for the strikers, National Labor Relations Board v. Mackay Co., 304 U.S. 333, 345, 58 S.Ct. 904, 82 L.Ed. 1381, but as soon as the strike was terminated and the strikers were willing to return to work, petitioner could not discriminate against them because of their union activities or their participation in the strike in order to discourage employees in the exercise of their rights under the Labor Act. The employees must be free from all restraint or coercion by the employer. Wilson & Co. v. National Labor Relations Board, 7 Cir., 120 F.2d 913. In our case, after the strike was terminated petitioner did not reinstate the 11 strikers, but it did hire 12 new men. In view of all the circumstances, we think there was ample evidence upon which to base the Board's findings. In reaching this conclusion we have not overlooked petitioner's contention that it was denied a fair and impartial hearing. In making this point, the contention appears to be bottomed upon the fact that because the trial examiner made a finding that the petitioner had not discriminated against the 11 employees and the fact that the Board reached a conclusion opposite to that of the trial examiner, ergo, the Board has failed to scrutinize the record fairly and impartially. It will be enough to say that an examination of the intermediate report of the trial examiner discloses that the trial examiner had not considered the fact that after the strike was terminated, petitioner hired 12 new men.

The Board also found that Anthony Delisky was discharged and refused employment because of his union membership and activity. Petitioner claimed he was discharged because he refused to obey orders. We have examined the record and think it clearly appears that Delisky's work ceased as a consequence of a current labor dispute and that there is evidence to support the finding that he was discharged for union activity.

Finally, petitioner contends that the order is illegal. The Board ordered that reinstatement be made at the branch houses where discriminatory refusals to reinstate occurred, with dismissal, if necessary, of those employees hired after the strike. The order provided that if at any of the branches there were not sufficient positions available to effect complete reinstatement, those not put to work were to be placed on a preferential list and that the employees be given back pay computed to commence at the time each would have been recalled had there been no discrimination. In the case of any branch house where fewer vacancies developed than there were strikers able to fill them, the order provided that back pay should be computed after ascertaining which of the strikers, in the absence of discrimination, would have been selected to fill vacancies as they developed,—the determination to be according to petitioner's prevailing employment policy. The order also contained the usual provision restraining petitioner from interfering with or coercing its employees "in any other manner" in the exercise of their rights under § 7 of the Act, 29 U.S.C.A. § 157.

We do not think that the requirement that the employees discriminated against be reinstated with back pay is illegal or arbitrary, see National Labor Relations Board v. Mackay Co., supra, 304 U.S. at page 348, 58 S.Ct. 904, 82 L.Ed. 1381, nor do we believe that under the circumstances of this case, the blanket order comes under the condemnation of the Express Publishing case, National Labor Relations Board v. Express Pub. Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930. See also National Labor Relations Board v. Entwistle Mfg. Co., 4 Cir., 120 F.2d 532 and National Labor Relations Board v. Reynolds Wire Co., 7 Cir., 121 F.2d 627.

The petition to set aside the Board's order is denied. The request for the enforcement of the order is granted.