**WESTERN CARTRIDGE CO. v. NATIONAL LABOR RELATIONS BOARD et al.**

**WESTERN CARTRIDGE EMPLOYEES' INDEPENDENT UNION v. SAME.**

Nos. 8142, 8155.

Circuit Court of Appeals, Seventh Circuit.

March 1, 1943.

min Uhler, all of Washington, D. C., for respondents.

Before EVANS, KERNER, and MINTON, Circuit Judges.

KERNER, Circuit Judge.

These cases are here on separate petitions by Western Cartridge Company (hereinafter referred to as "Company") and the Western Cartridge Employees' Independent Union (hereinafter referred to as "Independent") to review and set aside, and on request by the National Labor Relations Board for the enforcement of, an order[1] of the Board, issued pursuant to the provisions of § 10(c) of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., requiring the employer (1) to cease and desist from (a) giving effect to its individual contracts of employment with employees etc., (b) dominating Independent, (c) recognizing Independent, (d) giving effect to its certain agreements with Independent in respect to rates of pay, etc., (e) discouraging membership in the International Molders and Foundry Workers Union of North America, Local No. 333, affiliated with the American Federation of Labor, (f) in any other manner interfering with its employees in the exercise of their rights under § 7 of the Act; and (2), affirmatively to (a) withdraw all recognition from Independent, (b) offer William Elliott full reinstatement, and (c) make him whole for loss of pay.

The company is a Delaware corporation engaged in the manufacture of munitions and has more than 6000 employees at its East Alton, Illinois, plant. Jurisdiction is not in dispute.

The proceeding before the Board was instituted by the American Federation of Labor and charged that the company, in order to create a barrier to union organization among its employees, induced its employees to sign individual contracts which infringe rights guaranteed by the Act; that by continuing that practice after the effective date of the Act, the company violated § 8(1); that it disparaged outside unions and warned its employees not to join such unions; and that by dominating and interfering with the formation of Independent and contributing to its support, and by discharging William Elliott, it violated § 8(1) (2) and (3) of the Act.

R. H. McRoberts, Henry Davis, and Wayne Ely, all of St. Louis, Mo. (Bryan, Williams, Cave & McPheeters, of St. Louis, Mo., of counsel), for petitioners.

Joseph A. Padway, Robert A. Wilson, Robert B. Watts and Ernest A. Gross, all of Washington, D. C., Jack G. Evans, of St. Louis, Mo., and Howard Lichtenstein, Asst. Gen. Counsel, Roman Beck, and Ar-

242

The questions presented are (1) whether the Board's findings of fact concerning the unfair labor practices are supported by the evidence; (2) whether the Independent was accorded a fair hearing; and (3) whether the order is valid.

The record discloses that from 1915 to 1921 the company followed the practice of having its employees sign individual contracts, which, if lived up to, assured the employees of a bonus. It ceased its practice in 1921 because of the depression, but revived the practice in 1933, when business was at a very low ebb and when there was much industrial unrest resulting in part from unionization.

The Company, since July, 1933, has urged its employees to sign the individual contracts. After three months' service, all new employees are either sent to the Personnel Department by their foremen or given notice to report there for an interview. In these interviews, the employees are told of the benefits which the contract provides and are urged to sign. They were told in writing that "The signing of such a contract is optional on your part." When a contract is about to expire, the employee is notified to report to the contract office for the purpose of signing a renewal. The contract is for a fixed term, either six months or one year, and obligates the employee to devote his full time throughout that term to the business of the company; breach of that undertaking entails, at the option of the company, the employee's immediate suspension or dismissal, and its faithful performance is made a condition precedent to the employee's receiving the bonus stipulated for in the contract. To obtain the bonus, the employee must continue in the employ of the company for the entire period of his contract. The contract also provides that the company may terminate it in the event of the "non-operation, or the material curtailment of the operations, of the plant * * * due to * * * strikes." The employee in such case forfeits the bonus plus any sum which the company has deducted from his wages pursuant to the contract if the contingency resulting in the shut-down or curtailment is due "to the fault of the employee."

About July 8, 1941, the company incorporated the East Alton Manufacturing Company, a Maryland corporation, which took over the operation of the smokeless powder division, and on August 2, the new corporation entered into a collective agreement with Local 22574, concerning which more anon, providing, among other things, that the individual contracts between the company and some 423 employees of the smokeless powder division should not be assigned to the new company, and that like contracts should not in the future be offered the employees of that division.

During the summer of 1933 a group of the company's employees began to discuss the question of whether they desired a company union or no union at all, and the subject was violently agitated throughout the plant. Thereupon, Vice-President Olin addressed a mass meeting of the employees and discussed with them the possibility of forming an employees representation plan, such as the company's Works Council Plan at New Haven.

There was no union among the company's employees from 1933 to 1937, but in the spring of 1937, after several C.I.O. organizing meetings had been held and some of the employees had signed applications for membership, steps were taken at the plant to oppose that movement and to organize the Independent. Charles Taylor, a machinist, was its principal organizer. He discussed plans for this organization with other employees, but before going ahead with its formation, Taylor called on General Manager Bassett to inquire whether the company had any objection to the formation of the Independent and whether the rights of the employees under the individual contracts would be adversely affected by the formation of the Independent. Bassett replied that they would not be, that the company would not object to the inside union provided the employees "stayed within their rights," and did not solicit members on company time and property. June 4, 1937, Taylor and his associates engaged an attorney and launched a membership drive during working hours, at times in the presence of foremen. The record does not disclose that the company voiced any objection to the use of its time for this purpose. June 25, 1937, Independent requested recognition and on July 26, submitted to the company a prepared working agreement. August 10, the company submitted to Independent a contract to remain in force for one year and thereafter until terminated by a prescribed written notice, recognizing Independent as the bargaining agent of the company's employees "with respect to all matters not

covered by the contracts of employment between the Company and those of its employees who have made them"; stipulating that "neither the company nor the Independent admit or assert any right to change said contracts of employment without the consent of the parties thereto"; and providing "that if the parties should from time to time agree that a modification of the individual contract was desirable, the proposed change would be 'recommended' to the employees." This contract was executed on August 12, 1937.

In January, 1941, a campaign to organize the employees in the smokeless powder division was commenced and on January 31 a mass meeting of these employees was held, at which a large number signed applications for membership in the American Federation of Labor. February 5, Local 22574 was chartered, and on March 13 it asked for recognition which was denied on the ground that the unit was inappropriate. Thereupon, this local petitioned the Board requesting certification in the smokeless powder division. June 13, following an election, the Board certified the local as the exclusive bargaining representative in that division. After the local had won the election, the company disregarded the Board's unit determination, continued to recognize the Independent as the bargaining agent for all employees in the plant, and entered into a working agreement with the Independent.

The record also discloses that from 1937 to December, 1940, the membership of the Independent declined and that its position was being threatened by the campaign of the A. F. of L. To offset this advance, Independent's executive committee, in November 1940, appealed to Bassett and requested him "to do something to keep the [Independent's] membership up." The committee was informed that the company had authorized a wage bonus of two per cent to be given the signers of the individual contracts and that "if the union [Independent] got credit for it, it would build * * * [Independent's] membership up." After this conference, a notice to that effect was posted on the bulletin board. It also appears that throughout this period, particularly after the A. F. of L. had commenced its campaign, the company engaged in varied coercive measures to keep the employees from joining the A. F. of L. It will not be necessary to recite such evidence in detail. We cite, for example, the instance in which the superintendent of the smokeless powder division sent for the president of Local 22574 and said to him: "I expected a rough sort of a fellow—being mixed up with a union like you are," and told him that the union was "no good," adding revealingly, "Why don't you come in as a committee and talk with me about it instead of going over to East St. Louis and get[ting] a pot-bellied racketeer to do your business for you?" men who were "bosses and wouldn't work," men who "lived off the wages of employees paid out in union dues."

The company argues that under the language of National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U. S. 1, 45, 57 S.Ct. 615, 81 L.Ed. 893, 108 A. L.R. 1352, its duty to bargain collectively with representatives of its employees does not preclude such individual contracts as it might elect to make directly with individual employees.

A similar contention was made in National Labor Relations Board v. J. I. Case Company, 134 F.2d 70, decided by this court on February 26, 1943, in which the respondent tendered to each of its employees a contract, execution being voluntary, fixing wages and terms of employment. A union certified as the exclusive bargaining representative requested the respondent to bargain collectively with it. Respondent refused on the ground it could not negotiate with the union in any matter affecting the rights and obligations of respondent and its employees "under the individual contracts." We indicated our belief that other decisions of the Supreme Court established the rule that any existing contractual right interfering with the effectuation of the legislative intent must yield to the duty imposed upon both employer and employee, and that contracts must be understood as having been made not only with reference to existing legislation, but also with reference to the possible exercise of the rightful authority of the Government, and that no obligation of contract may be invoked to defeat that authority. And we held that the power and right of the employer and employee to enter into individual contracts must be subordinated to and so effectuated as not to interfere with full achievement of the purpose of the Act.

The principal question in this case is whether the Board's findings of facts are supported by substantial evidence—that the company dominated and interfered with

the formation of Independent, and whether the Board was justified in its conclusion that the company's conduct toward Local 22574 amounted to interference with its employees in the exercise of their rights under § 7 of the Act.

The company contends that the Board was not justified in finding that by urging and persuading its employees to sign the individual contracts after the Act went into effect, it had interfered with the employees' right to self-organization.

 As to this aspect of the case, there is no dispute as to the evidence. That being so, the question is, what inference should be drawn from the evidence? That function belongs to the Board. Nor does the possibility of drawing either of two inconsistent inferences from the evidence prevent the Board from drawing one of them. National Labor Relations Board v. Nevada, etc., 316 U.S. 105, 62 S.Ct. 960, 86 L.Ed. 1305. The Board found that the effect of the contracts has been to forestall union activity among the company's employees and to create a permanent barrier to union organization among them. We agree with counsel for the Board that interference is no less interference because it is accomplished through allurements rather than coercion, when, as here, the system is employed to stem a tide of organization and is adopted as a means of eliminating outside unions as collective bargaining agents of the company's employees. National Licorice Co. v. National Labor Relations Board, 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799. Such attempts have been condemned, National Labor Relations Board v. Martin Bros. Box Co., 7 Cir., 130 F.2d 202.

 The company and the Independent contend that the fact that the company welcomed the organization of the Independent, extended privileges to it and preferred that union to any other, does not constitute discrimination, domination of or interference with such union. With this contention, under the circumstances here appearing, we cannot agree. The employees must be free from all restraint or coercion by the employer. This freedom is their legal right. The Act imposes upon an employer total and complete impartiality, necessitating the utmost of honest neutrality, Valley Mould etc., v. National Labor Relations Board, 7 Cir., 116 F.2d 760, 764. Even slight suggestions as to the employer's choice between unions may have telling effects, International Association of Machinists, etc., v. National Labor Relations Board, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50. The conduct of the company fell far short of the required standard. Here there was open and known hostility to one union and clear discrimination against it. International Association of Machinists, etc., v. National Labor Relations Board, supra, 311 U.S. 78, 61 S.Ct. 83, 85 L.Ed. 50. The company's officials exerted great efforts to sustain, and urged its employees to support, the Independent; it vilified leaders of the A. F. of L. union, disparaged that union as "no good," and attempted to bolster up the Independent as a buffer against the A. F. of L.—all these tactics indicating a design to strengthen the Independent. Certainly such actions were not conducive of the neutrality and impartiality required by the Act. In our opinion it constituted a violation of § 8(1) (2) of the Act. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309.

 The company also argues that its conduct was innocuous, that there was no domination, and that such statements as were made were "utterly ineffective," that not one of the employees had "joined the Independent because of any such statements or had refrained from joining, or had withdrawn from Local 22574." It will be enough to say that it is not necessary that the coercive conduct had its intended or desired effect, National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368. It is only necessary to show that the employer interfered, restrained, or coerced. Rapid Roller Co. v. National Labor Relations Board, 7 Cir., 126 F.2d 452, 457.

Independent contends that because the trial examiner refused to permit individual members of the Independent to testify with respect to the reasons why and the circumstances under which they had joined, it was denied a fair hearing. The argument is that such testimony was material and tended to prove that these employees had joined the Independent of their own free will, and to disprove interference by the company.

 To be sure, as a general rule, findings cannot be said to have been fairly reached unless material evidence which might impeach, as well as that which will support, the Board's findings is heard and weighed, National Labor Relations Board

v. Indiana & Michigan, etc., Co., January 18, 1943, 63 S.Ct. 394, 87 L.Ed. ——. Uncontradicted testimony of a large number of employees to the effect that they were free from coercion and under no sense of constraint cannot avail the Independent, Bethlehem, etc., v. National Labor Relations Board, 1 Cir., 114 F.2d 930, 937, and American Enka Corp. v. National Labor Relations Board, 4 Cir., 119 F.2d 60, 62, and a showing of non-coercion in one instance does not disprove an affirmative showing of coercion in another instance, United States v. General Motors Corp., 7 Cir., 121 F.2d 376, 405. The recognition of constraint calls for a high degree of introspective perception. Bethlehem Shipbuilding case, supra, 114 F.2d 937, and it would be a rare case where the finders of fact could probe the precise factors of motivation underlying each employee's choice. Normally, the conclusion that the employees' choice was restrained by the employer's interference must of necessity be based on the existence of conditions or circumstances which the employer created or for which he was fairly responsible, and as a result of which it may reasonably be inferred that the employees did not have that complete and unfettered freedom of choice which the Act contemplates. National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 588, 61 S.Ct. 358, 85 L.Ed. 368.

In the instant case, the record discloses that the examiner permitted Independent to adduce the testimony of witnesses who had participated in its organization as to their reasons for joining, but that he refused to receive the testimony of several thousand employees as to their reasons for joining the Independent after its formation.

■ The Board found as a fact that the company had interfered with the formation of the Independent, basing its findings upon the evidence earlier set forth in this opinion disclosing favors granted by the company to the Independent, and upon the evidence showing the unswerving purpose of the company to repel outside unions. Under such circumstances, the rejected testimony being cumulative and when viewed against the cogent, specific evidence of the company's interference, we cannot say that there was an abuse of discretion and that the Independent had not received a fair hearing.

■ The Independent next contends that there is no substantial evidence justi-fying its disestablishment. We have been told frequently that if the findings of the Board are supported by substantial evidence, they are conclusive, and the Supreme Court has been insistent that the admonition be strictly observed, National Labor Relations Board v. Indiana & Michigan, etc., supra. We have already observed that the facts set out above furnish substantial evidence for the conclusion that the company had interfered with its employees in the exercise of their rights and that it had interfered with the formation of the Independent. Such evidence justified the Board's order of disestablishment.

We now pass to the discharge of William Elliott, who entered the employ of the company in 1925, his last period of employment continuing from 1930 until July 25, 1941, when he was discharged, as claimed by the company, because he was a "disgruntled, dissatisfied employee, highly critical of the management and everything that the management did in running the business, and one who did not hesitate to express his feelings openly * * *, not only to his superior officers, but to his fellow employees."

■ The record discloses that during the period of his employment, Elliott was a good workman. In 1941, he became the representative of the Independent and in the spring of that year, when the American Federation of Labor was waging its campaign, he was chided by Superintendent Day for not being more aggressive in discharging his duties as such representative. Day testified that part of the reason for discharging Elliott was his failure to represent the Independent in a manner satisfactory to the company. Elliott resigned from the Independent and in July joined the A. F. of L. July 23, 1941, he was elected financial secretary of Local 333, and his election immediately became known to the supervisors. He was discharged July 25. The Board found that the company knew and accepted Elliott as an outspoken and critical employee, and had expressed no disapproval of his critical attitude until he abandoned the Independent and became active in Local 333; that Elliott's failure to act as the Independent's representative was a factor motivating his discharge; and that Elliott's critical attitude was used as a pretext to justify his discharge. The evidence supports these findings. They are binding upon this court.

246

Finally, the company contends that the order is illegal. The decision of the Board provides that nothing in the order shall be taken to require the company "to vary those wage, hours, and other substantive features of its relations with the employees themselves, which the respondent [company] has established in the performance of such agreements." We think that paragraphs 1(f) requiring the company to cease and desist from "in any other manner" interfering with the exercise by its employees of the rights guaranteed them by § 7 of the Act, 1(a) directing the company to cease giving effect to the individual contracts (without prejudice to the assertion by the employees of any legal rights they may have acquired under such contracts), and 2(d) instructing the company to notify its employees that it will not enforce the contracts or in the future require such contracts to be executed, are in conformity with the orders approved in National Labor Relations Board v. Express Pub. Co., 312 U.S. 426, 438, 61 S.Ct. 693, 85 L.Ed. 930, and National Licorice Co. v. National Labor Relations Board, 309 U.S. 350, 364, 367, 60 S.Ct. 569, 84 L.Ed. 799.

We conclude the order is legal; consequently, the petition to set aside the Board's order will be denied, and the request for its enforcement will be granted.

It is so ordered.