## WESTERN CARTRIDGE CO. v. NATIONAL LABOR RELATIONS BOARD.

No. 8324.

Circuit Court of Appeals, Seventh Circuit.

Dec. 16, 1943.

Rehearing Denied Jan. 27, 1944.

Henry Davis and R. H. McRoberts, both of St. Louis, Mo., for petitioner.

Robert B. Watts and Ernest A. Gross, N.L.R.B., both of Washington, D. C., and Lester Asher, N.L.R.B., of Chicago, Ill., for respondent.

Before KERNER and MINTON, Circuit Judges, and LINDLEY, District Judge.

MINTON, Circuit Judge.

On March 24, 1943, the National Labor Relations Board in a case brought before it by Local 12418, District 50, of the United Mine Workers of America, hereinafter called the Union, found the Western Cartridge Company, hereinafter called the Company, guilty of unfair labor practices in violation of Sections 8(1) and 8(3) of the National Labor Relations Act, 29 U.S.C.A. § 158(1), (3), hereinafter called the Act. The Board entered the usual order. The Company seeks to review this order, and the Board has applied for its enforcement. The sole question before us is whether or not there is substantial evidence to support the Board's findings.

We consider first the Board's finding that the Company violated Section 8(1) of the Act. Various labor organizations had in the past attempted to organize the Company's employees. The Congress of Industrial Organizations began such a campaign in 1937, and the American Federation of Labor in 1940. Late in 1941 and early in 1942, the Union, which was then affiliated with the CIO, started to organize the Company's employees. When the employees appeared in the plant wearing their union buttons, they were ridiculed and chided by their foremen for doing so. Walter Crawford, the foreman of the Cupping Department, where the employees herein concerned worked, on several occasions made derogatory and ridiculing remarks to the men about wearing their union buttons. To employee Page, Crawford said, "Page, as long as you have been here, I would not have thought you would have joined the Union."

Page replied, "Well, I thought maybe I would better myself."

Crawford responded, "If the Company would lay you off, you would raise hell."

Page replied, "If they did lay me off for joining the Union, yes."

Crawford said, "They can do it."

Page replied, "No, they can't."

To which Crawford responded, "You will see."

Another employee testified that when he entered the plant wearing his union button, Foreman Crawford grabbed hold of it and said, "What are you doing with this button on?" and "What are you getting for wearing it?" to which the employee responded that, "Well, if you want it I will give it to you," and started to do so. The foreman and his assistant withdrew laughing. The employee testified he thought they were trying to make a fool of him at the time.

Later Foreman Crawford in a conversation with employee Bailey referred to the activities of Herron and Seeger, who were leaders among the Union men. Crawford remarked in substance that Herron and Seeger were causing the trouble in there and that after the war the Company would remember who had been the strong men for the Union.

These incidents standing alone may be considered weak support for a finding of violation of Section 8(1) of the Act. However, the Company has a long, consistent record of persistent opposition to the organization of its employees. This Court quite recently sustained and enforced an order of the National Labor Relations Board in which it found the Company guilty of several unfair labor practices. National Labor Relations Board v. Western Cartridge Co., 7 Cir., 134 F.2d 240. In view of the Company's known hostility to the organization of its employees and its established record of un-

fair labor practices, we think that the conduct of the foreman, Crawford, in this instance was quite persuasive evidence that the Company's attitude toward the organization of its employees had not changed. Under all of the circumstances of this case, we think that there was substantial evidence to support the Board's finding that the Company had violated Section 8(1) of the Act.

As to the violation of Section 8(3): The employees on the day shift in the Cupping Department of the Company's plant, not as members of the Union or under any claim of bargaining rights, had been negotiating with the Company about certain grievances as to working conditions and an increase of wages. They concluded that the Company was engaging in dilatory tactics and determined to cease work unless the Company set a definite time for a meeting at which these grievances might be taken up. The Company did not comply with this request, and the day shift quit work the afternoon of July 3, 1942. Shortly thereafter, the Company's officers and armed guards met with the employees of the day shift who had ceased work and were still about the plant. The Company superintendent told the employees that they could go back to work if they wished. None offered to return. One of the employees spoke up and stated that the employees were willing to go back to work at once if the Company would give them a definite date for hearing their grievances. To this, the superintendent responded that the request would not be considered until the men went back to work and asked them if they desired to return to work. When none responded, the superintendent ordered that they be given suspension slips. This was done. These slips notified the employees to appear before the Discipline Board on Monday, July 6, at nine a. m. After the men had received these notices, their indentification badges were taken from them, and they were escorted from the plant by the armed guard.

When the second shift came to work and discovered what had happened, they also refused to go to work unless the Company would set a definite date for the hearing of the employees' grievances and would give the first shift employees their hearing before the Discipline Board the next day, which was Saturday, instead of waiting until Monday. These demands the Company superintendent rejected and sent word to the second shift employees to report for work immediately. The employees, including some of those of the third shift who had arrived at the plant, did not heed the warning at that time. Later that same day, one of the employees told the Company superintendent that the men had determined not to report to work until the dispute had been settled. Whereupon the superintendent declared that the employees had gone on strike and their action warranted removal of their names from the payroll. He instructed the employee to notify his fellow employees that anyone on the second and third shifts who did not report for work that day would be suspended and would not be allowed to return to work until he had received the permission of the Discipline Board. Some of the men returned to work, but most of the employees of the second and third shifts decided not to report for work until the controversy had been settled. On July 4, notices were prepared suspending the employees of the second and third shifts who had not reported for work the day before, and the charge assigned therefor was failure to appear for work without reason. The suspended employees were also directed to appear before the Discipline Board Monday, July 6, at ten a.m.

On July 6, the employees appeared at the Company's gates and requested that all of the employees of all shifts be permitted to appear before the Discipline Board at the same time. This the Company refused. Thereupon the employees left the plant. On July 7, the Discipline Board of the Company discharged the eighteen men of the first shift who had gone on strike, and the vacancies resulting from their discharge were permanently filled by new employees between July 8 and July 15. The Discipline Board, however, accorded different treatment to the other shifts, keeping their jobs open for them until they were willing to return.

On July 8, employee Seeger, as representative of his fellow striking employees, reported to the Personnel Director of the Company, and on behalf of himself and his fellow employees advised the Personnel Director that they would like to return to work. Their offer was rejected. Seeger was informed that the employees of the first shift were discharged and that the men on the other shifts would be put back to work whenever they were willing to accept reinstatement through the Disci-

pline Board. This information Seeger conveyed to the striking employees. From time to time thereafter, shifts other than the first shift reported to work and, following their appearance before the Discipline Board, were reinstated. None of the employees of the first shift was reemployed.

█ Thus it will be seen that out of a labor dispute grew an economic strike. The strike was not caused by any unfair labor practice of the Company. Since the strike grew out of a labor dispute, the employees maintained their status as employees of the Company. 29 U.S.C.A. § 152(3); National Labor Relations Board v. Mackay Radio & Telegraph Co., 304 U. S. 333, 344, 347, 58 S.Ct. 904, 82 L.Ed. 1381; Wilson & Co. v. National Labor Relations Board, 7 Cir., 124 F.2d 845, 847, 848; Firth Carpet Co. v. National Labor Relations Board, 2 Cir., 129 F.2d 633, 635, 636. Without violating Sec. 8(3) of the Act, the Company had a right to discharge these employees or to refuse to take them back into its employ, as long as it did not discriminate against them in such a manner as *to encourage or discourage membership in any labor organization.* Failure to reemploy striking employees because they engaged in a strike may be an interference with their right to engage in "concerted activities" as provided in Section 7 of the Act and would therefore constitute an unfair labor practice under Section 8(1) of the Act. Does such a violation of Section 8(1) in and of itself warrant a finding of a violation of Section 8(3)? We think not. Employees may under Section 7 of the Act "have the right * * * to engage in concerted activities" irrespective of any labor organization, and interference with such "concerted activities" would be an unfair labor practice within the meaning of Section 8(1) of the Act. It does not follow that a finding of interference with "concerted activities" or discrimination because of "concerted activities" is a violation of Section 8(3) of the Act. Under this Section of the Act to constitute the unfair labor practice of discrimination, the discrimination in regard to hire and tenure must have the purpose "to encourage or discourage membership in any labor organization."

The Board has found discrimination because of concerted activities. We think there is evidence to support such findings.

We must go one step further. Was that discrimination to encourage or discourage membership in any labor organization? Neither the Board nor the Trial Examiner set forth any facts to support their finding that the discriminatory conduct of the Company toward the hire and tenure of the day shift, the employees named in Schedule A, was for the purpose of encouraging or discouraging membership in any labor organization. That such conduct in some cases might be for that purpose cannot be doubted. That it was done in the case at bar for that purpose has not been shown by any evidence. The Board points out the discriminatory conduct of the Company in these words: "By thus 'discharging' and subsequently replacing the day-shift employees alone because of their part in a lawful strike and because the respondent regarded their participation in the strike as more heinous than that of other strikers, the respondent engaged in discrimination as between the day-shift strikers and the other strikers." The Board then makes a recital that cannot be disputed that "Such discrimination because of union activities constitutes a violation of Section 8(3) of the Act." Without bothering to point out any evidence to support a finding that such discrimination *was for the purpose of encouraging or discouraging membership in any labor organization,* the Board finds such discrimination "thereby discouraged membership in the Union, etc."

█ We are unable to find in the record any substantial evidence to support a finding that the Company's acts toward its striking employees in the matter of their hire and tenure were taken to discourage membership in a labor organization. It must be remembered that the Company was engaged in the manufacture of munitions of war during a war, and the employees through their leaders had pledged themselves not to strike. In violation of that solemn pledge they struck, instead of resorting to the ample machinery set up by the Government to settle labor disputes. Maybe the employees in peace time would have been justified in striking, but were they justified in doing so in war time, in violation of their pledge not to do so? Furthermore, the striking employees were not acting as members of the Union. They expressly disclaimed any such action. The strike was not authorized or approved by

the Union and was not used to further any purpose of the Union. It was a "wildcat" strike. The employees were acting as individuals, disclaiming any standing as members of any labor organization. No organizational work of the Union was going on at the time in the Cupping Department. The workmen therein were almost all members of the Union. The employees were acting outside the Union. The strike was a thing apart from any labor organization.

■ We recognize the exclusive right of the Board to draw inferences but there must be some evidence from which the inference can be drawn. We do not think the evidence supports an inference that the Company's conduct toward the striking employees on a "wildcat" strike was for the purpose of discouraging membership in a labor organization, especially since the day shift, which was found to have been discriminated against, belonged to the same Union as the other shifts, which were not discriminated against. If the Company was discriminating against its employees because of Union activities, why was the discrimination limited to one shift? The other shifts struck, too; but they were not discriminated against.

The Board also found that one Goessman was discharged and refused employment discriminatorily "thereby discouraging membership in the Union as well as in labor organizations generally." Goessman was a janitor in the Brass Specialty Department, a separate department from the Cupping Department. When the strike in the Cupping Department occurred on July 3, the Company, in order to man the machines vacated by the strikers, called upon the employees of the Brass Specialty Department to take over the machines. About 3:40 in the afternoon of that day, Goessman was summoned to the Company offices and charged by its officials with attempting to persuade his fellow employees in the Brass Department to refuse the Company's request that they man the machines in the Cupping Department which had been left idle by the strike. Goessman denied the charge. No one confronted him to take issue with his denial. The Company suspended him and sent him no further word.

The Trial Examiner found and the Board adopted his finding as follows: "There is no evidence that Goessman ac-

tually engaged in such conduct. Hence, it appears that he was discharged because the respondent believed he had engaged in this conduct. In view of the total lack of evidence to support the respondent's defense, the undersigned finds that the respondent in suspending Goessman and thereafter discharging him did so because of its belief in his alleged assistance to the strikers in the cupping department."

■ This finding shows only that the Company discharged Goessman for a reason that did not exist in fact. Does it therefore follow as a reasonable inference that Goessman was discharged in order to discourage his membership in a labor organization? Goessman was not even shown to have been a Union man. According to his testimony, he did not know the employees in the Cupping Department were going to strike. It was not a strike called or sponsored by the Union. No organizational effort was being supported by the strike. There is no evidence of any Union activity or organizational effort of any kind that was in any way related to the discharge of Goessman. If there had been some Union activity in which Goessman was or might be interested, to which his arbitrary discharge could have been related, there might have been some basis for the Board's inference that his discharge was to discourage membership in the Union as well as in labor organizations generally. Inconsiderate discharge standing alone will not support an inference that the discharge was for the purpose of discouraging membership in a labor organization. We think there is not substantial evidence to support the Board's finding as to Goessman.

One McDonald also was found to have been discharged discriminatorily and for the purpose of discouraging membership in a labor organization. The strike in the Cupping Department began July 3 by the stoppage of work on the part of the day shift. McDonald was a member of the day shift, but he was not working when the strike started because his wife was sick. About July 8 or 9, he called his foreman at the Company plant. We set forth McDonald's own testimony:

"Well, I told him I was not working the day that they had the trouble there and wanted to know if I still had a job there, and he said yes for me to come to work. I told him I heard there was trouble and

I don't feel like coming to work until it is settled. He said there was no trouble now. They had a little dispute but it is all settled and for me to come in to work. I told him, would I have to go to the Discipline Board?

"Q. Did you ask him if you had to go through the Discipline Board? A. He said yes. I asked who was on it and he said himself and a couple of other men would be there. I told him I would see him later then.

"Q. And have you ever reported to the Discipline Board? A. No sir.

"Q. Do you want your job back? A. Yes, I would like to have it back in a way if they want to do right by us. Otherwise I would not care to go back."

McDonald testified on cross-examination that on July 6 he went down to the plant, found the boys on strike, and decided to stay away, and that he had never been back to the plant since.

■ McDonald was not discharged. He quit. After he had quit, he never went back or sought to be returned to his old job. He not only quit, but he made it final by his own voluntary act. How can it be contended that McDonald was even discharged, let alone discriminatorily? There is not a scintilla of evidence to support the Board's finding as to McDonald.

The Board's order will be enforced as to the violation of Section 8(1) of the Act and refused as to the alleged violation of Section 8(3) of the Act. An order will be prepared accordingly.

On Petition for Rehearing.

The Board argues in its petition for rehearing that we have in effect held that the day shift, which acted in concert to strike and with whom the other strikers cooperated, was not a labor organization within the meaning of the Act. We held no such thing. The Board had found "that the respondent, by its course of conduct on and after July 3, 1942, as set forth above and in the Intermediate Report, discriminated in regard to the hire and tenure of employment of all its striking employees, and thereby discouraged membership in the Union * * *." As a conclusion of law based upon this finding, the Board held: "By discriminating in regard to the hire and tenure of employment of * * * its striking employees and thereby discouraging mem-

bership in Local No. 12418, District 50, United Mine Workers of America, the respondent has engaged in and is engaging in unfair labor practices, within the meaning of Section 8(3) of the Act." The "Union" referred to in the findings was the C. I. O.

The Board had found and held that the discrimination discouraged membership in the *Union*. We simply held that there was no substantial evidence to support a finding that such discrimination thereby discouraged membership in the *Union*, that is, the C. I. O. All of the evidence was to the effect that the Union had no connection with the activities of the strikers. The discrimination found by the Board was not discrimination to discourage membership in such "labor organization" as the day shift and its cooperating fellow workers represented, but such discrimination as "discouraged membership in the Union." We held only that the discrimination as practiced by the respondent was not shown by substantial evidence to have been for the purpose of discouraging membership in the *Union*. If it was done to discourage membership in the loose organization that represented the striking employees, there was no finding of the Board to that effect. We must take the findings of the Board as made and not as they might have been made.

It is next urged that we erred in holding that the striking employees were not acting as members of the Union. This was not a case where union men conceal their union affiliation in order that their employer may not be influenced thereby. This was a case where the workers were known to be Union members, but were not acting as members of the Union; and the Union had nothing to do with the strike. This was a "wildcat" strike in a war industry in time of war, and the Union accepted no responsibility therefor. From President Murray on down, the Union had pledged no strikes in war industries in war time and had denounced "wildcat" strikes. To find that these striking employees were acting for and on behalf of the Union would do violence to the facts and to the known policy of the Union from its President on down. It would violate the Union's pledge of no strikes in a situation that the Union had carefully kept out of.

The Board next insists that the discharge of the first shift necessarily discouraged membership in a "labor organization." If it did, that was not what the Board found.

The Board found, as we have heretofore pointed out, that such conduct discouraged membership in the *Union*.

Finally, the Board urges that for a violation of Section 8(1), 29 U.S.C.A. § 158 (1), it could have applied the same remedy of reinstatement with back pay which it applied for the violation of Section 8(3). The Board found that the discrimination in hire and tenure was for the purpose of discouraging membership in the Union and for such discrimination the respondent was guilty of a violation of Section 8(3). The Board never found that the discrimination in the hire and tenure had any relation to a Section 8(1) violation. The Board says it is not powerless to apply the same remedy for a violation of Section 8(1). We have no way of knowing what the Board might find and what remedies it might apply if given a "second bite at the cherry." We know only that the Board did not apply such remedy, and on that record we act and not on some other record the Board might have made.

The petition for rehearing is denied.