## OLIN INDUSTRIES, Inc., WINCHESTER REPEATING ARMS CO. DIVISION v. NATIONAL LABOR RELATIONS BOARD.

### No. 13275.

United States Court of Appeals
Fifth Circuit.

Aug. 7, 1951.

Benjamin E. Gordon, Boston, Mass., Gordon & Epstein, Maurice Epstein and Allan Seserman, all of Boston, Mass., Samuel Leiter, Chelsea, Mass., of counsel, for petitioner.

George J. Bott, Frederick U. Reel, Atty. NLRB, A. Norman Somers, Asst. Gen. Cnsl. NLRB, David P. Findling, Assoc. Gen. Cnsl. NLRB, and Maurice Alexandre, all of Washington, D. C., for respondent.

Before McCORD, RUSSELL, and RIVES, Circuit Judges.

RIVES, Circuit Judge.

This proceeding is here upon petition of Olin Industries, Inc., Winchester Repeating Arms Company Division,[1] to review and

---

1. This represents the fourth time petitioner has been before the Labor Board and the courts on charges of unfair labor practices. The Court of Appeals for the Seventh Circuit has twice enforced Board orders against petitioner, and the Court of Appeals for the Second Circuit has enforced one Board order against it. See Western Cartridge Company v. Labor Board, 7 Cir., 134 F.2d 240, certiorari denied 320 U.S. 746, 64 S.Ct. 48, 88 L.Ed. 443; Western Cartridge Company v. Labor Board, 7 Cir., 139 F.2d 855; Labor Board v. Western Cartridge Company, 2 Cir., 138 F.2d 551, certiorari denied 321 U.S. 786, 64 S.Ct. 780, 88 L.Ed. 1077. On one occasion petitioner was adjudged in contempt by the Second Circuit for failure to obey its mandate. Labor Board v. Western Cartridge Co., No. 15, order issued December 12, 1944. Petitioner finally purged itself of contempt at the end of 1946.

This is the first time, however, that petitioner has sought review of a Board order against it in this Circuit. Its plant

set aside an order of the National Labor Relations Board issued against petitioner on September 29, 1949. In answer to the petition, the Board requests enforcement of its order. The decision and order of the Board are reported at 86 N.L.R.B. 203.

The instant controversy arises out of a series of alleged unfair labor practices, some of which occurred in 1942 during an attempt to organize petitioner's plant, and others which were committed in the year 1946 during a controversy between petitioner and its employees regarding their working hours.

The evidence in support of the Board's findings as to the discriminatory discharges of three named employees in 1942 may be briefly summarized as follows:

Petitioner discharged three of its employees, Mumford, Bucci, and Gordon in 1942 within a short period of time after they joined the Union. Mumford had been employed as an operator of an automatic machine in petitioner's plant. On August 6, 1942, she signed an application card for membership in the Union. Two days later, after receiving a report that she had solicited fellow employees to become members of the Union, Snyder, the personnel superintendent in petitioner's plant, discharged her. Reinstatement was offered to Mumford if she would reveal the names of the girls that belonged to the Union, but she refused. After her discharge, and on the day preceding a hearing before an arbitrator appointed by the National War Labor Board to consider her grievances, Mumford was informed by a representative of petitioner that she could return to her job. The following day she reported to petitioner's employment office, filed an application for employment, and was told to obtain a release from the company for which she was then working. When she returned with her release she was informed by an employee in the personnel office that no job was available for her.

The employee, Ruth Bucci, applied for membership in the Union on August 12, 1942, became a union steward on August 13, and was discharged from petitioner's employment on August 15th. Like Mumford, Bucci had been active in distributing union application cards and soliciting members for the Union prior to her discharge. As a result of this activity she was reported to a foreman who stated that "he didn't know there were any union activities in the shop" and that he "would take care of it". There is further testimony that when Bucci was discharged on August 15th, she was told that she was being dismissed for "union activities".

Harry Gordon made application for union membership on August 3, 1942, and was also made a union steward. For the next two days he distributed five or six union application cards in petitioner's plant during recess periods. On August 18th, he was taken to Superintendent Snyder's office by one of petitioner's supervisory employees, who told him that Snyder wished to see him "about union activities." Snyder stated to Gordon during the interview that he had heard about Gordon being a union worker and distributing union application cards among the employees. There is further testimony that Gordon was then discharged with the statement that "it was a pity that he had gotten mixed up with the union, and that his work had been very satisfactory and he was sorry to see him go."

With regard to the alleged unfair labor practices which occurred at petitioner's plant in September, 1946, it was shown that in April of that year petitioner had made certain changes in the schedule of working hours for the employees in its brass rolling mill which involved a substantial increase in week-end work and frequently required certain employees to work in their respective shifts on seven consecutive days. Under this schedule petitioner practically eliminated overtime pay for week-ends and

is situated at New Haven, Connecticut, where it manufactures guns, rifles, ammunition and other products. There is no jurisdictional issue presented, for petitioner concedes it is engaged in commerce within the meaning of the Act. The Board concedes that this Court has jurisdiction over the instant proceeding because petitioner happens to have a warehouse in Houston, Texas.

for consecutive work beyond five days a week through the use of an irregular work schedule. This change in working hours aroused considerable unrest and dissatisfaction among petitioner's employees, who registered through their committees frequent but unsuccessful protests. Acting on the theory that the Union was responsible for the discontent of its employees, petitioner, through its supervisory employees, began to interfere with and restrain the organizational efforts of the workers. On a number of occasions employees were interrogated concerning their union affiliation, and warned to refrain from further membership or activity in the Union upon penalty of discharge. Petitioner actually discharged a number of its employees who had been most active in the Union. As as result, the employees of the rolling mill began to picket the plant in protest. There is evidence that while the picketing was going on several of petitioner's supervisory employees sought out a large number of the strikers and attempted to induce them, by means of veiled and outright threats of discharge, to abandon their strike and return to work. Personnel Counselor Goin admitted attempting to persuade approximately 175 strikers to return during this period, and testified that some of these workers were approached while they were at home and about 10 while they were engaged in picketing. Many of the workers were advised to renounce the strike and return to their jobs before they had been absent for a period of fourteen consecutive days, or they would automatically be subject to discharge under company rules.

With regard to the alleged lockout, and the discharge and refusal to reinstate those employees who engaged in the temporary work stoppages in petitioner's rolling mill in September, 1946, it was shown that on September 15, 1946, petitioner posted a new schedule of working hours which was even more objectionable to the workers than the schedule which had been adopted in April of that year. This action of petitioner provoked the rolling mill employees into concerted action. About September 20, 1946, employees of all three shifts of the rolling mill met together and formulated demands

for redress of their grievances to be presented to petitioner through committees appointed to represent each shift. The employees resolved that a fifteen minute work stoppage would be held the following day on each of the three shifts, immediately following the fifteen minute lunch period allowed by petitioner to the workers. The committees were instructed to present the demands in writing to petitioner during these work stoppages. In accordance with this plan, the employees on the first shift, with the exception of a few workers permitted to continue their duties in order to prevent damage to machinery and materials, did not return immediately to their work at the end of their lunch period at 12:15 p. m. on Saturday, September 21, but assembled near the washroom instead. The men were ordered to return to work, and were not permitted to present or discuss their grievances with the plant representatives during the work stoppage. The plant guards were called, but no violence ensued, and a few minutes later at the suggestion of one of the workers on the committee, Destadio, the men resumed their work. Several hours later the three employees who were the active leaders of the grievance committee on the first shift, Destadio, Baldino and Bonito, were summoned to Manager Boak's office and summarily discharged, on the ground that they had instigated the work stoppage which Boak characterized as an illegal strike.

When the employees on the second shift learned of the discharges of Destadio, Baldino, and Bonito, they decided that in addition to the other grievances to be presented by their committee during the work stoppage scheduled for their shift, they would also insist upon reinstatement of these three discharged employees. Accordingly, when they failed to return to their work at the end of their lunch period they attempted to present a copy of their grievances to Manager Boak, who refused to accept them and again called the plant guards. Boak later sought to ascertain the names of the employees engaged in the work stoppage and an interview with the most active leaders of the grievance committee on the second shift, but these employees refused to

go to his office for fear of discharge. The employees did not return to their work during the remainder of their shift, but remained in the rolling mill until their shift was over at 11:00 p. m. when they left without disturbance.

When the employees on the third shift reported for work at 11:00 p. m., they found that the plant guards had been increased at the gates, the rolling mill had been shut down, and they were not permitted to enter the premises. Limited operation of the rolling mill was resumed the following day, September 22nd, but only a few employees selected by company officials were admitted for work, and they were given new passes to distinguish them from the other employees. The employees who were locked out thereupon staged a parade and began to picket the plant.

Negotiations were later entered into between representatives of petitioner, the Union, and the rolling mill employees, in company with federal and state mediators, and an attempt was made to settle the dispute. Petitioner offered to reinstate most of the employees who had been locked out with the exception of Destadio, Baldino, and Bonito, but this offer was refused by the rolling mill employees who insisted that these workers had been discriminatorily discharged and were also entitled to reinstatement.

On October 20, 1946, no agreement to end the strike having been reached, the strikers voted to withdraw their picket lines and make an unconditional application *en masse* the following day for reinstatement. The next day between 250 and 300 of the strikers assembled at petitioner's personnel office early in the morning ready and willing to return to work. However, on instructions from Manager Boak, only about 75 or 100 employees were rehired. Some of those employees who were taken back were not fully reinstated but were hired as new employees, in several instances without seniority rights or vacation and bonus privileges. The remaining employees, after waiting two days in line for reinstatement, concluded that their applications were unsuccessful and left to resume their picketing.

Without further review of the voluminous testimony, we consider it sufficient to observe that the Board's findings of fact as to the discriminatory discharge of petitioner's named employees in both 1942 and 1946, as well as to petitioner's restraint and coercion of its employees in their organizational efforts and its lockout and refusal to reinstate those employees who engaged in the temporary work stoppages in the rolling mill in September, 1946, are supported by substantial evidence on the record considered as a whole, and hence are here conclusive. Universal Camera Corp. v. Labor Board, 340 U.S. 474, 71 S.Ct. 456; National Labor Relations Board v. Robbins Tire & Rubber Co., 5 Cir., 161 F.2d 798; Gullett Gin Company, Inc. v. Labor Board, 5 Cir., 179 F.2d 499, reversed on other grounds 340 U.S. 361, 71 S.Ct. 337; Labor Board v. Kennametal, Inc., 3 Cir., 182 F.2d 817; Labor Board v. American Mfg. Co., 2 Cir., 106 F.2d 61.

Petitioner contends that the issuance and amendment of the complaint in the instant proceeding violated Section 10 (b) of the Act, 29 U.S.C.A. § 160(b), for the reason that the complaint was based on charges filed more than six months after the occurrence of the alleged unfair labor practices, and the amendment of the complaint so as to include the alleged discriminatory discharges of other named employees did not merely elaborate the original charge with particularity, but in effect revived substantive violations which Section 10(b) of the Act was intended to destroy. In this connection, since it is without dispute that all of the charges were filed and served prior to the effective date of the Amended Act, we conclude that the complaint was not barred by the limitation provision of Section 10(b), and that this court's decisions in Labor Board v. Itasca Cotton Mfg. Co., 179 F.2d 504, and Labor Board v. Westex Boot & Shoe Company, 5 Cir., 190 F.2d 12, foreclose petitioner's contentions in this regard. Cf. National Labor Relations Board v. Postex Cotton Mills, 5 Cir., 181 F.2d 919.

We further find no merit in the contention that those employees who were discharged in 1942, Mumford, Bucci and Gor-

don, were discharged for cause for violation of a rule prohibiting solicitation on company time and company property without permission. The record reveals that the solicitations for which these employees were discharged were, in each instance, for union membership, and were made practically without exception during lunch and rest periods, rather than during working hours.[2] The argument that since the employees were paid during these lunch and rest periods they actually constituted company time and were subject to company rules is without support or foundation. We think the Board has properly approached this problem of solicitation on company property on the basis of the distinction between actual working and nonworking time, rather than on the basis of the immaterial distinction between paid and unpaid time. The proper rule was recognized by the Board in Peyton Packing Company, 49 N. L.R.B. 828, 843–844, enforced by this court, National Labor Relations Board v. Peyton Packing Co., 142 F.2d 1009, certiorari denied 323 U.S. 730, 65 S.Ct. 66, 89 L.Ed. 585, and quoted with approval by the Supreme Court in Republic Aviation Corp. v. Labor Board and (Labor Board v. Le Tourneau,) 324 U.S. 793, 803–804, 65 S.Ct. 982, 988, 89 L.Ed. 1372: "The Act, of course, does not prevent an employer from making and enforcing reasonable rules covering the conduct of employees on company time. Working time is for work. It is therefore within the province of an employer to promulgate and enforce a rule prohibiting union solicitation during working hours. Such a rule must be presumed to be valid in the absence of evidence that it was adopted for a discriminatory purpose. It is no less true that time outside working hours, wheth-

er before or after work, *or during luncheon or rest periods,* is an employee's time to use as he wishes without unreasonable restraint, although the employee is on company property. * * *" (Emphasis added.) See also, National Labor Relations Board v. May Department Stores, 8 Cir., 154 F.2d 533, 537.

Any other rule might seriously impair the right of employees to organize collectively under the Act by placing a premium on attempts by employers to allocate wages or salaries and company time over the entire workweek, so as to prohibit employees from discussing union activities or soliciting union membership at practically any convenient time. Clearly the Act does not require enforcement of such a harsh rule of silence upon employees. Accordingly, the discharges of Mumford, Bucci, and Gordon for soliciting during nonworking time, even had they been discharged for that reason rather than for their union activities,[3] would clearly violate the Act. National Labor Relations Board v. Le Tourneau, supra.

With regard to the Board's finding that 87 of petitioner's employees made application for reemployment on October 21, 1946, and were thereafter entitled to reinstatement as unfair labor practice strikers, petitioner contends that it was justified in its refusal to reinstate those employees who did not testify at the hearing before the Trial Examiner because no convincing proof was offered to show that they ever made application for reinstatement and were refused. In this connection, numerous witnesses testified without contradiction and the Board found that pursuant to a vote at a union meeting, all the strikers went to the plant on October 21, 1946, to report for work.[4] Moreover, this testimony is to

2. It was shown that petitioner had frequently relaxed its rule in this respect except in those instances where the solicitation was for union membership.

3. The Trial Examiner and Board found to the contrary.

4. Employee Morton testified: "We all went back to Winchester's personnel Monday morning". Employee Conte stated: "We all went up to the front of personnel". Another employee, Los, tes-

tified: "Well, all the guys were down there, a long line of them". Raffone, another employee, stated: "We all had made plans to go meet and go there as a body. We did." Employee Wilson testified: "Well we all assembled out in front of the office that day". Employee Muir stated: "Well, all the fellows were up at personnel". Other supporting testimony was given by employees Evans, Weaver, Ballard, and Reid.

618

a large extent corroborated by one of petitioner's principal witnesses, assistant personnel superintendent Willers, who estimated that about 250 strikers assembled at the personnel office of petitioner on October 21, 1946, and that only about 50 were rehired that day.[5] The Board concluded there was already substantial evidence in the record on which to base the finding that all of the strikers had applied for and were entitled to reinstatement and that "further testimony on this issue would merely have been cumulative". In view of all the testimony establishing the mass application by the strikers for reinstatement, the admission of petitioner's witness Willers, and petitioner's failure to rebut such evidence or to show that these 87 named strikers did not actually apply for reinstatement, we conclude that the findings of the Board in this regard are supported by substantial evidence on the record considered as a whole. Universal Camera Corp. v. Labor Board, supra; see also, Eagle-Picher Mining and Melting Co. v. Labor Board, 8 Cir., 119 F.2d 903, 914.

It follows that the petition to modify or set aside the Order of the Board should be denied, and that the order should be enforced in its entirety.

Order Enforced.

5. The record further reveals that an offer was made at the hearing before the Trial Examiner to place the remaining strikers who had not testified on the stand to prove their application for reinstatement individually, but this offer was rejected.